UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA

v.                                            CASE NO. 8:19-cr-425-MSS-AEP

MARCUS LLOYD ANDERSON

**UNITED STATES' RESPONSE TO DEFENDANT'S
SENTENCING MEMORANDUM AND SUPPLEMENTAL
MEMORANDUM REGARDING LOSSES**

The United States of America files this response to the defendant's sentencing memorandum, Doc. 77, and supplemental memorandum regarding losses under USSG §2B1.1(b), stating in support as follows:

**I.  RELEVANT FACTUAL RECORD**

*Stipulated Facts from the Defendant's Plea Agreement, Doc. 38*

MARCUS ANDERSON established Tampa Bay Behavioral Health Centers ("TBBHC") in 2011. Doc. 38 (Plea Agreement) at 18. He enrolled TBBHC into the Florida Medicaid program ("Medicaid"), which was administered by the Agency for Health Care Administration ("AHCA"). *Id.* AHCA also funded and had oversight responsibility for Florida Medicaid managed care organizations ("MCOs"), including, pertinently, Simply Healthcare Plans, Inc. (d/b/a AmeriGroup Florida) (hereinafter, "AmeriGroup") and WellCare of Florida, Inc. (d/b/a Staywell Health Plan of Florida) (hereinafter, "WellCare"). *Id.*

From in or about May 2015 through in or about March 2018, TBBHC submitted numerous false and fraudulent claims to Medicaid and the Medicaid MCOs AmeriGroup and WellCare. *Id.* at 19. TBBHC did so by, among other means, seeking payment for medical providers—including Dr. M.A., Dr. H.C., and LMHC J.K.—who, at the purported time of service, were not affiliated with TBBHC. *Id.*

TBBHC also falsely and fraudulently billed Medicaid and Medicaid MCOs for services that were never provided to beneficiaries. *Id.* Such beneficiaries included, for example, those who were hospitalized or jailed elsewhere at the time of the purported services—meaning that such beneficiaries could not have been treated at TBBHC as ANDERSON had falsely represented. *Id.* For example, TBBHC falsely and fraudulently billed services for the beneficiary M.L. *Id.* According to the false and fraudulent claims submitted by TBBHC, M.L. had supposedly received group therapy services from Dr. H.C. from in or about January 2018, through in or about March 2018. *Id.* By then, however, Dr. H.C. was no longer affiliated with TBBHC. *Id.* M.L. denied receiving the aforesaid services from TBBHC. Hospital records from a third-party facility further confirmed that, during the billed period, M.L. was hospitalized beginning in or about December 2017. *Id.* M.L. was later discharged directly to the care of a residential assisted-living facility ("ALF"), where he continually resided until at least in or about June 2018. *Id.* at 19–20. Consequently, TBBHC could not have provided treatment to M.L. between January 2018, and

March 2018, when he was in the care and custody of other medical/residential facilities. *Id.* at 20.

Similarly, beneficiary D.B. purportedly received services from Dr. H.C. at TBBHC between in or about January 2018, through March 2018. *Id.* Again, by then, Dr. H.C. was no longer affiliated with TBBHC. *Id.* When interviewed in or about June 2018, D.B. asserted that it had been months since receiving services from TBBHC. *Id.* During this period, TBBHC falsely and fraudulently billed Medicaid for about 63 claims for D.B., receiving approximately $9,072 in payments. *Id.*

Likewise, in or about February 2016, ANDERSON falsely and fraudulently billed Medicaid and Medicaid MCOs for approximately 11 claims for beneficiary R.A. *Id.* During the billed period, however, R.A was detained at a local jail, meaning he could not and did not receive the purported services from TBBHC. *Id.*

ANDERSON also submitted numerous false and fraudulent claims to Medicaid and/or Medicaid MCOs, including but not limited to those referenced on the table below, as set forth in Doc. 38 at 21:

| On or About Date of Service | Purported Provider | NPI | Medicaid Provider ID | Purported Beneficiary |
|---|---|---|---|---|
| April 13, 2016 | M.A. | 1013098169 | 001476800 | D.B. |
| April 20, 2016 | M.A. | 1013098169 | 001476800 | I.B. |
| February 1, 2016 | J.K. | 1386048031 | 013596900 | S.D. |
| January 12, 2016 | J.K. | 1386048031 | 013596900 | J.N. |
| January 8, 2018 | H.C. | 1831272046 | 039609500 | S.J. |
| January 15, 2018 | H.C. | 1831272046 | 039609500 | M.L. |
| February 24, 2016 | H.C. | 1831272046 | 039609500 | R.A. |

*Additional Factual Record*

The facts set forth below are neither an exhaustive record nor a verbatim transcript of any testimony taken in this case. Rather, the brief factual record below is assembled to aid the Court in its loss-calculation analysis under USSG §2B1.1(b):

On June 22, 2021, the father of victim S.J. ("H.B.J.") testified that S.J. had left TBBHC in December 2017. H.B.J. testified that, as of December 2017, S.J. had been moved to a different facility unaffiliated with TBBHC. This testimony is corroborated elsewhere. First, as the defendant certified in the Plea Agreement, Doc. 38 at 21, TBBHC had submitted a false and fraudulent claim for S.J. for service on or about January 8, 2018, which is consistent with H.B.J.'s testimony that S.J. had left TBBHC the prior month. Further, discovery produced to the defendant in October 2019 contained, pertinently, medical records for S.J. from the St. Petersburg Nursing and Rehabilitation Center ("SPNRC"). *See* DISC-0072518 to -73085. SPRNC's records included detailed chart information and notes regarding S.J. The admission date reflected in these records was consistently December 13, 2017. For example, the below "Admission Record," *see* DISC-0072521, reflected "12/13/2017" as S.J.'s admission date and his "previous address" as the business address for TBBHC. (The Admission Record and other records included herein have been carefully redacted to protect personally identifying information or "PII" in conformance with Local Rules.)

[Admission Record form from St. Petersburg Nursing & Rehab, dated 8/15/2018 21:00:06 ET. Resident Name: J____, S____; Unit: West; Room/Bed: 220-A; Admission Date: 12/13/2017; Init. Adm. Date: 12/13/2017; Orig. Adm. Date: 12/13/2017; Resident #: 8695. Previous address: 765 22nd Avenue S #2, Saint Petersburg, FL, 33705; Previous Phone #: (816) 590-0003; Legal Mailing address: Same as Previous Address. Sex: M; Race: Black or African American. Admitted From: Nursing home; Admission Location: Other SNF. Primary Insurance Policy Name: MolinaHealthcare. Primary Payer: FL MCD MNG - Molina Healthcare. Most Recent Hospital Stay: To Be Determined. The Admission Date fields and Previous address are circled in red.]

Other SPRNC records showed not only S.J.'s admission date, but the duration of his stay at their facility, which was not affiliated with TBBHC. For example, a vitals tracker for S.J., *see* DISC-0073082 to -83, reflected his date of admission (or "DOA") as "12/13/2017." The tracker in turn logged S.J.'s vital signs, which had been recorded on a periodic basis from his admission date on December 13, 2017, through August 2018 (meaning after TBBHC's closure). A page of S.J.'s vitals tracker, reflecting the Bates stamp "DISC-0073082," is set forth in full on the following page:

5

**St. Petersburg Nursing & Rehab**     **Weights and Vitals Summary**

Resident: J█████, S█████     DOB: █████     Gender: Male     MR#: █████

Date Range: 12/13/2017 to 8/15/2018

esident: J█████, S█████
ital: Blood Pressure, Blood Sugar, Height, O2 sats, Pain Level, Pulse, Respiration, Temperature, Weight
Effective Date Range: 12/13/2017 - 08/15/2018

| Date | Value |
|---|---|
| J█████, S█████ | Location: West 220 A, Height: 74 Inches, **DOA: 12/13/2017** |

**Blood Pressure Summary**

| Date | Value |
|---|---|
| 08/06/2018 23:59 | 108/72 mmHg (Lying l/arm) |
| 08/06/2018 23:56 | 112/72 mmHg (Lying l/arm) |
| 07/09/2018 03:22 | 107/67 mmHg (Lying l/arm) |
| 06/06/2018 02:41 | 117/71 mmHg (Lying r/arm) |
| 05/10/2018 03:35 | 122/80 mmHg (Lying l/arm) |
| 04/12/2018 23:56 | 128/76 mmHg (Lying l/arm) |
| 03/05/2018 02:35 | 134/78 mmHg (Lying r/arm) |
| 12/20/2017 23:08 | 130/70 mmHg |

**Pulse Summary**

| Date | Value |
|---|---|
| 08/06/2018 23:59 | 78 bpm (Regular) |
| 08/06/2018 23:56 | 66 bpm (Regular) |
| 07/09/2018 03:22 | 72 bpm (Regular) |
| 06/06/2018 02:41 | 77 bpm (Regular) |
| /10/2018 03:35 | 88 bpm (Regular) |
| 04/12/2018 23:56 | 86 bpm (Regular) |
| 03/05/2018 02:35 | 81 bpm (Regular) |
| 12/20/2017 23:14 | 68 bpm (Regular) |

**Respiration Summary**

| Date | Value |
|---|---|
| 08/06/2018 23:59 | 20 Breaths/min |
| 08/06/2018 23:56 | 20 Breaths/min |
| 07/09/2018 03:22 | 18 Breaths/min |
| 06/06/2018 02:41 | 20 Breaths/min |
| 05/10/2018 03:35 | 22 Breaths/min |
| 04/12/2018 23:56 | 20 Breaths/min |
| 03/05/2018 02:35 | 22 Breaths/min |
| 12/20/2017 23:25 | 18 Breaths/min |

**Temperature Summary**

| Date | Value |
|---|---|
| 08/06/2018 23:59 | 96.1 °F (Oral) |
| 08/06/2018 23:56 | 97 °F (Oral) |
| 07/09/2018 03:22 | 98.1 °F (Oral) |
| 06/06/2018 02:41 | 97.8 °F (Oral) |
| /10/2018 03:35 | 99.1 °F (Oral) |
| 04/12/2018 23:56 | 98.8 °F (Oral) |

Only vitals with data are displayed

Page 26 of 244     Run on: 8/15/2018

DISC-0073082

On June 22, 2021, Dr. M.A. initially testified that he had left TBBHC in "May or June 2015." Dr. M.A. later testified that his separation from TBBHC occurred slightly earlier in April 2015. That Dr. M.A. left TBBHC in April 2015 (rather than "May or June 2015") is corroborated elsewhere. For example, in an email dated July 14, 2015, *see* DISC-0092773, Dr. M.A. wrote to a WellCare representative as follows: "The last day I saw clients for TBBH was on February 13, 2015. I had sent him a termination notice in January 2015, but Marcus the owner of TBBH and his partner called back and got into lengthy conversation, wanted an extention [sic] of the termination. I have not signed off any any [sic] charts passed [sic] April 19, 15[.]" Dr. M.A.'s April 2015 separation date is further corroborated by the payroll record that the defendant produced at the sentencing hearing on June 22, 2021. The payroll record reflected that Dr. M.A.'s final compensation from TBBHC had been paid on May 1, 2015. Consistent with a separation date of April 2015, the Indictment charged that the scheme or artifice had begun "in or about May 2015." See Doc. 1 (Indictment) at ¶ 10. Consistent with that, the defendant—who pleaded to a scheme or artifice that began as of that date, *see id.*—stipulated that "[f]rom in or about May 2015 . . . TBBHC submitted numerous false and fraudulent claims" to Medicaid, AmeriGroup, and WellCare, Doc. 38 (Plea Agreement) at 19 (certified factual basis). Dr. M.A. also acknowledged that TBBHC patients were placed on six-month-long treatment plans. Dr. M.A. further testified that he had directed Mr. Anderson to no

7

longer use his credentials to bill for TBBHC patients after separation.

On June 22, 2021, Michael Wysocki of AmeriGroup testified that adjudicating a claim for payment required that the treating or rendering provider be in the employ of the group, here, TBBHC at the time of service. He also testified that AHCA's rules applied to AmeriGroup. That AHCA's rules governed the relationship between TBBHC and AmeriGroup was acknowledged in the defendant's Plea Agreement, Doc. 38. Specifically, the defendant certified that AHCA funded and had oversight responsibility for Florida MCOs, including, pertinently, AmeriGroup. *Id.* at 18. AHCA's publicly available rules and handbooks, in turn, state the following pertinent definitions:

- "2.130, Treating Provider – Individual provider who personally renders Florida Medicaid covered services, or assumes responsibility for rendering Florida Medicaid covered services, through personal supervision, on behalf of a Florida Medicaid group provider." Florida Medicaid Definitions Policy at 11, available at http://ahca.myflorida.com/medicaid/review/General/59G_1010_ Definitions.pdf (last accessed July 8, 2021).

- Personal Supervision – The supervision of services furnished while the supervising practitioner is in the building, and for which the supervising practitioner signs and dates the medical records (charts) within 24 hours of the provision of the service. AHCA Provider General Handbook Agency at Page B-13, available at https://ahca. myflorida.com/medicaid/review/General/59G_5020_Provider_Ge neral_REQUIREMENTS.pdf (last accessed July 8, 2021).

## II.     USSG §2B1.1(b) LOSS CALCULATION

Defendant certified in the Plea Agreement that "between in or about May 2015 through in or about March 2018, TBBHC submitted numerous false and fraudulent claims" to Medicaid and the Medicaid MCOs AmeriGroup and WellCare. Doc. 38 at 19. TBBHC did so using the following means:

1. "seeking payment for medical providers (including Dr. M.A., Dr. H.C., and LMHC J.K.) who, at the purported time of service, were not affiliated with TBBHC"; and

2. "falsely and fraudulently billing for services that had never been provided to beneficiaries."

*Id.* at 19–20 (quoting the stipulated factual basis). These means and corresponding loss calculations under USSG §2B1.1(b) are addressed in the sections that follow.

*Beneficiaries Who Had Not Received Services*

The defendant certified that "[b]etween in or about May 2015 through in or about March 2018, TBBHC submitted numerous false and fraudulent claims to Medicaid and/or Medicaid MCOs [by] billing for services that had never been provided to beneficiaries." Doc. 38 (Plea Agreement) at 18–19. Specific beneficiaries and their corresponding losses are described in turn next:

D.B.

The defendant certified in the factual basis of the Plea Agreement that, between in or about January 2018 through March 2018, TBBHC had falsely and fraudulently billed Medicaid for 63 claims for beneficiary D.B. *Id.* at 20. For these

9

false and fraudulent claims, the defendant stipulated that TBBHC had received approximately **$9,072** in Medicaid payments. *Id.*

R.A.

The defendant certified in the factual basis of the Plea Agreement that, in or about February 2016, the defendant had falsely and fraudulently billed Medicaid and/or Medicaid MCOs for approximately 11 claims for beneficiary R.A., a period when R.A was detained at a local jail. *Id.*

Native-format claims data produced to the defendant in October 2019 has been filtered for the beneficiary R.A. for the period of February 19 to 29, 2016. The total for these claims is **$1,584**. The attached appendix sets forth detailed information for each of these claims in **Table 1**.[1]

M.L.

As the defendant certified in the factual basis of the Plea Agreement, M.L. was hospitalized in a third-party facility beginning in or about December 2017. *Id.* at 19. M.L. was later discharged directly to the care of an ALF, where he continually resided until at least in or about June 2018. *Id.* at 19–20. As the Plea Agreement certified, TBBHC could not have provided treatment to M.L. between January and March 2018. *Id.* at 20.

---

[1] In addition to the native-format claims data produced to the defendant in October 2019, the United States emailed to the defendant, through counsel, native-format copies of the filtered data reflected in the appendix for review and verification. A copy of all native-format claims data and any derivative filtering is also available in CD/DVD media format for the Court's review.

Native-format claims data produced to the defendant in October 2019 has been filtered for the beneficiary M.L. for the period of January 1, 2018, to March 31, 2018. The total for these claims is **$7,873**. The attached appendix sets forth detailed information for these claims in **Table 2**.

<u>S.J.</u>

According to the testimony of H.B.J. on June 22, 2021, as corroborated by medical records and the Plea Agreement, S.J. was hospitalized in a third-party facility beginning in or about December 2017. *Supra*, § I at 4–6.

Native-format claims data produced to the defendant in October 2019 has been filtered for the beneficiary S.J. for the period of January 1, 2018, to March 31, 2018. The total for these claims is **$9,169**. The attached appendix sets forth detailed information for these claims in **Table 3**.

*Medical Providers Who Were Not Affiliated<br>with TBBHC at the Purported Time of Service*

The defendant also certified that "[b]etween in or about May 2015 through in or about March 2018, TBBHC submitted numerous false and fraudulent claims to Medicaid and/or Medicaid MCOs [by] seeking payment for medical providers (including Dr. M.A., Dr. H.C., and LMHC J.K.) who, at the purported time of service, were not affiliated with TBBHC." Doc. 38 (Plea Agreement) at 19.

Dr. M.A.

According to the testimony of Dr. M.A. on June 22, 2021, as corroborated by the defendant's payroll record and an email dated July 14, 2015, *see* DISC-0092773, Dr. M.A. had separated from TBBHC as a treating provider on or before May 1, 2015. *Supra*, § I at 7–8. AHCA's governing rules explain that the "treating provider" must "assumes responsibility for rendering Florida Medicaid covered services, through personal supervision." *See* Florida Medicaid Definitions Policy at 11, available at http://ahca.myflorida.com/medicaid/review/General/59G_1010_ Definitions.pdf (last accessed July 8, 2021). "Personal Supervision" is in turn defined to mean "[t]he supervision of services furnished while the supervising practitioner is in the building, and for which the supervising practitioner signs and dates the medical records (charts) within 24 hours of the provision of the service." *See* AHCA Provider General Handbook Agency at Page B-13, available at https://ahca. myflorida.com/medicaid/review/General/59G_5020_Provider_General_REQUIR EMENTS.pdf (last accessed July 8, 2021). In light of these definitions, a treating provider's separation from TBBHC is the moment when all billing using the treating provider's credentials must cease.

Application of AHCA rules to the above factual record supports that TBBHC should have stopped billing for Dr. M.A. as a "treating provider" when he separated. The United States submits that the record supports a separation date of May 1, 2015.

12

*See, supra*, § I at 7–8. Native-format claims data produced to the defendant in October 2019 has been filtered for services where TBBHC identified Dr. M.A. as the treating provider for the period of May 1, 2015, to March 31, 2018. The total for these claims is **$1,074,804**. This total amount was paid to TBBHC by AmeriGroup in the amount of **$268,379.50 (Table 4)**[2] and by WellCare in the amount of **$806,424.50 (Table 5)**. The attached appendix sets forth detailed information for these claims in the referenced tables.

To the extent that the Court should ultimately determine that Dr. M.A.'s separation from TBBHC was later in time (meaning "May or June 2015"), filtered claims data have been provided to that effect. Native-format claims data produced to the defendant in October 2019 has been filtered for services where TBBHC identified Dr. M.A. as the treating provider for the period of July 1, 2015, to March 31, 2018. The total for these claims is **$879,358.25**. This total amount was paid to TBBHC by AmeriGroup in the amount of **$268,379.50 (Table 4)** and by WellCare in the amount of **$610,978.75 (Table 7)**. The attached appendix sets forth detailed information for these claims in the referenced tables.

---

[2] AmeriGroup Claims data from AmeriGroup, which has been filtered for Tables 4 and 6, reflect TBBHC's unique National Provider Identifier ("NPI") 1124317698 in the field labeled "BILLING_PROVIDER_NPI." NPIs are maintained in a public national registry on the internet. This registry confirms that the NPI 1124317698 belongs to TBBHC. *See* https://npiregistry.cms.hhs.gov/registry/search-results-table?number=1124317698&addressType=ANY (last accessed July 9, 2021). Additionally, AmeriGroup claims data begins as of October 2015 based on TBBHC's enrollment date in the Medicaid MCO. Given TBBHC's enrollment date, the filtered claims data in Table 4 represents the total amount for claims billed by TBBHC for Dr. M.A. on or after October 2015, which post-dates his separation from TBBHC by several months.

Finally, the defendant appeared to argue that, given the six-month-long treatment plans in place at TBBHC, billing for a "treating provider" was acceptable if the plan was in place, even post-separation. Assuming that Dr. M.A. is believed to have separated from TBBHC in "May or June 2015," the outer temporal limit of any six-month-long treatment plan would end on or by January 1, 2016. Consequently, for the Court's ease, native-format claims data produced to the defendant in October 2019 has been filtered for services where TBBHC identified Dr. M.A. as the treating provider for the period of January 1, 2016 (*i.e.*, after any six-month-long treatment plan would have ended) until March 31, 2018. The total for these claims is **$246,825**, which had been exclusively paid to TBBHC by AmeriGroup. The attached appendix sets forth detailed information for these claims in **Table 6**.

Dr. H.C.

The certified facts in the Plea Agreement twice reference that, by in or about January 2018, "Dr. H.C. was no longer affiliated with TBBHC." *Id.* at 19–20. Native-format claims data produced to the defendant in October 2019 has been filtered for services where TBBHC identified Dr. H.C. as the treating provider for the period of January 1, 2018, to March 31, 2018. The total for these claims is **$48,725**. The attached appendix sets forth detailed information for each of these claims in **Table 8**.

14

*USSG § 2B1.1(b) Loss-Calculation Summary*

The United States submits that the losses at bar should, at a minimum, include the following false and fraudulent claims: (1) all claims for any beneficiary who had not actually received services, including, as detailed above, D.B., R.A., M.L., and S.J.; (2) all claims identifying Dr. M.A. as the treating or rendering provider as of May 1, 2015; and (3) all claims identifying Dr. H.C. as the treating or rendering provider as of January 1, 2018. The table below reflects that the total amount of losses for these claims would be $1,151,227, resulting in a 14-point increase under USSG §2B1.1(b)(1)(H):

| Beneficiary/ Treating Provider | Date Range | Total Amount |
|---|---|---|
| D.B. | Jan. 1, 2018–March 31, 2018 | $9,072 |
| R.A. | February 19–29, 2016 | $1,584 |
| M.L. | Jan. 1, 2018–March 31, 2018 | $7,873 |
| S.J. | Jan. 1, 2018–March 31, 2018 | $9,169 |
| Dr. M.A. | May 1, 2015–March 31, 2018 | $1,074,804 |
| Dr. H.C. | Jan. 1, 2018–March 31, 2018 | $48,725 |
| | TOTAL | $1,151,227 |

Adjusting Dr. M.A.'s separation date to July 1, 2015, would have no effect on the Guidelines calculation. TBBHC claims for Dr. M.A. beginning as of July 1, 2015, $879,358.25, with $268,379.50 paid to TBBHC by AmeriGroup (Table 4) and $610,978.75 paid to TBBHC by WellCare (Table 7). Because these amounts still exceed $550,000, the 14-point increase under USSG §2B1.1(b)(1)(H) would still apply:

15

| Beneficiary/Treating Provider | Date Range | Total Amount |
|---|---|---|
| D.B. | Jan. 1, 2018–March 31, 2018 | $9,072 |
| R.A. | February 19–29, 2016 | $1,584 |
| M.L. | Jan. 1, 2018–March 31, 2018 | $7,873 |
| S.J. | Jan. 1, 2018–March 31, 2018 | $9,169 |
| *Dr. M.A.* | *July 1, 2015–March 31, 2018* | *$879,358.25* |
| Dr. H.C. | Jan. 1, 2018–March 31, 2018 | $48,725 |
| | **TOTAL** | **$955,781** |

Finally, if the outer limit of a six-month-long treatment plan were assumed, with such treatment plan having begun as of July 1, 2015 (*i.e.*, the adjusted separation date for Dr. M.A.), TBBHC claims for Dr. M.A. beginning as of January 1, 2016, total $246,825 (Table 6). The total amount using this figure is $323,248, which results in a 12-point increase under USSG §2B1.1(b)(1)(G):

| Beneficiary/Treating Provider | Date Range | Total Amount |
|---|---|---|
| D.B. | Jan. 1, 2018–March 31, 2018 | $9,072 |
| R.A. | February 19–29, 2016 | $1,584 |
| M.L. | Jan. 1, 2018–March 31, 2018 | $7,873 |
| S.J. | Jan. 1, 2018–March 31, 2018 | $9,169 |
| *Dr. M.A.* | *Jan. 1, 2016–March 31, 2018* | *$246,825* |
| Dr. H.C. | Jan. 1, 2018–March 31, 2018 | $48,725 |
| | **TOTAL** | **$323,248** |

WHEREFORE, the United States respectfully asks this honorable Court to apply USSG §2B1.1(b)(1)(H) for loss-calculation purposes as the United States Probation Office had proposed, Doc. 79 at ¶42.

        Respectfully submitted,

        KARIN HOPPMANN
        Acting United States Attorney

By:   */s/ Kristen A. Fiore*
       KRISTEN A. FIORE
       Assistant United States Attorney
       United States Attorney No. 178
       400 North Tampa Street, Ste. 3200
       Tampa, Florida 33602
       Telephone: (813) 274-6000
       Facsimile: (813) 274-6358
       E-Mail: kristen.fiore@usdoj.gov

U.S. v. Marcus Lloyd Anderson         Case No. 8:19-cr-425-MSS-AEP

## CERTIFICATE OF SERVICE

I hereby certify that on July 9, 2021, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record:

    Jay A. Hebert, Esquire

                                               */s/ Kristen A. Fiore*
                                               KRISTEN A. FIORE
                                               Assistant United States Attorney
                                               United States Attorney No. 178
                                               400 North Tampa Street, Ste. 3200
                                               Tampa, Florida 33602
                                               Telephone: (813) 274-6000
                                               Facsimile: (813) 274-6358
                                               E-Mail: kristen.fiore@usdoj.gov